

Feb 24 2020

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 950 East Susitna Bay | ) Case No. 3:20-mj-00087-MMS |
| Wasilla, AK 99654 | ) |
| | ) |
| | ) |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, David A. Rose III, being first duly sworn, hereby depose and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is being submitted in support of an application for a search warrant for the 950 East Susitna Bay, Wasilla, Alaska (the "**Target Residence**");

2. As such, it does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant.

3. I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of the DEA and other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another DEA agent or law enforcement officer. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. In addition, this affidavit is based on information from the following sources:

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS



a. Oral and written reports about this and other investigations which I have received from federal agents and local law enforcement;

b. Public records;

c. My training and experience as a Special Agent and the training and experience of Special Agents of the DEA and other law enforcement officials.

4. As set forth below, there is probable cause to believe that Nathan SOFIANOS, Korina THOMPSON, and others, known and unknown, have committed and continue to commit crimes including distribution of controlled substances and possession of controlled substances with intent to distribute in violation of 21 U.S.C. § 841(a)(1), attempt and conspiracy to commit those offenses in violation of 21 U.S.C. § 846, use of a communication facility to facilitate a controlled substance offense in violation of 21 U.S.C. § 843(b), felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), and money laundering in violation of 18 U.S.C. § 1956. There is also probable cause to believe that the premises described in Attachment A will contain items of evidence that will enable investigators to more fully identify the names, phone numbers, and residences of associates of SOFIANOS, THOMPSON, and others known and unknown; and to identify the dates, times, and places for commission of illegal activities, including locations of drug sales, details surrounding drug shipments, methods and means of drug transportation and smuggling, and methods and means of transporting and/or laundering drug proceeds.

**BACKGROUND OF AFFIANT**

5. I am a Special Agent employed by the United States Drug Enforcement

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS
Page 2 of 14
Case 3:20-mj-00087-MMS   Document 1-1   Filed 02/24/20   Page 2 of 14

Administration (DEA) currently assigned to the Anchorage District Office. I have been employed by the DEA since December 2018. Prior to employment with the DEA, I was employed as a contractor with DEA working in the DEA's Asset Forfeiture Program and prior to that I was employed as an Insurance Fraud Investigator. I am a graduate of University of New Haven, where I obtained a Bachelor of Science in Criminal Justice, a Minor in Legal Studies, and a Certificate in Forensic Computer Investigations.

6. I am a graduate of the Drug Enforcement Administration's Basic Agent Training Class 217; as a result of my training and experience as a DEA Special Agent, I received training and practical experience in conducting investigations of controlled substances violations in conjunction with agents and officers from other jurisdictions. I have conducted and assisted in investigations which have led to the arrest and conviction of persons for violations dealing with sales, and possession of cocaine, heroin, fentanyl, methamphetamine, and other controlled substances, money laundering and the seizure and forfeiture of assets.

7. Based upon my experience, training, and information I have received from officers of other Federal, State and local law enforcement agencies involved in the investigation of controlled substance offenses and proceeds derived from the illegal possession and sale of controlled substances, I am aware of the following information about individuals involved in the illegal distribution of illegal controlled substances:

    a. That drug dealers often place assets, including accounts at financial institutions, in names other than their own to avoid detection by government or other

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS

law enforcement agencies.

b.	That even though these assets are in other names, the drug dealers continue to use these assets and exercise dominion and control over them.

c.	That drug dealers frequently maintain on-hand amounts of United States currency in order to maintain and finance their ongoing illegal drug business.

d.	That drug dealers often maintain books, records, receipts, notes, ledgers, computers, computer disks, tickets, money orders, cashier's checks, wire transfer receipts, and similar drug related financial documents and records pertaining to the transportation, ordering, sale and distribution of illegal drugs.

e.	That drug dealers commonly "front" (provide illegal drugs on consignment) to their clients and often keep the aforementioned items so they can account for their drugs, the money owed for these drugs, and who has or owes for these drugs.

f.	That the aforementioned books, records, receipts, notes, ledgers, tickets, money orders, cashier's checks, and similar financial documents and records, including computers, computer disks, diskettes, and hard drives, and other media are maintained where the drug dealers have ready access to them. Often the described records and documents are maintained on computers and electronic media in the drug trafficker's home.

g.	That it is common for drug dealers to conceal contraband, large amounts of currency, precious metals, jewelry, address lists, telephone lists, proceeds of drug sales, and records of drug transactions in secure locations within their residences,

yards, garages, offices, businesses, automobiles, safes, safe deposit boxes, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., for ready access and to conceal the same from law enforcement authorities.

h. That persons involved in illegal drug trafficking conceal in their residences, yards, offices, businesses, safes, garages, storage buildings, vehicles, safe deposit boxes, and obscure locations, caches of drugs, large amounts of currency, weapons, financial instruments, precious metals, jewelry, and other items of value and/or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in illegal drug trafficking activities. Also, drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

i. That drug dealers often purchase expensive vehicles, businesses and residences with the proceeds from their drug transactions. Also, that drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

j. That drug dealers amass large proceeds from the sale of illegal drugs, they often attempt to legitimize their profits and maintain evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money derived from their illegal drug distribution activities. That to accomplish these goals, drug dealers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money

drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, telephones, cellular telephones, facsimile machines, digital and various paging devices, and two-way radio systems. Furthermore, drug dealers frequently change telephone numbers, paging devices and telephone instruments.

k. That drug dealers commonly maintain addresses and telephone numbers in books or papers which reflect names, alias names, addresses, and telephone numbers for their associates in their illegal drug trafficking.

l. That drug dealers take or cause to be taken photographs, video and audiotapes of themselves, their associates, their property, and their illegal products. Furthermore, these drug dealers often maintain these photographs, video and audiotapes in their residences, offices, safes, garages, storage buildings, vehicles and safe deposit boxes.

m. That drug dealers frequently keep paraphernalia for packaging, diluting, weighing, and distributing the illegal drugs. Furthermore, this paraphernalia includes, but is not limited to, scales, plastic bags, diluting or "cutting" agents, boxes, trash compactors, heat sealers, and sealing tape.

n. That federal courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, and in particular, illegal trafficking in controlled substances.

o. That drug traffickers very often possess firearms and other weapons for the purpose of protecting their drug trafficking enterprises from the efforts of law

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS

Page 6 of 14
Case 3:20-mj-00087-MMS   Document 1-1   Filed 02/24/20   Page 6 of 14

enforcement authorities as well as from persons who might attempt to steal any drugs or money possessed by the drug traffickers.

p.  That drug traffickers often maintain extra residences as stash houses, meeting locations, and temporary housing for drug associates. These residences are frequently rented, purchased or titled in others names even though the residences remain in the control of the drug traffickers.

8.  In my experience as an investigator, illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers typically obtain and distribute controlled substances on a regular basis much as a distributor of a legitimate commodity would purchase stock for sale, and similarly, drug traffickers will have an inventory which will fluctuate in size depending upon the demand for the product. I find that it is common for drug traffickers to keep records of his illegal activities for a period extending beyond the time during which he actually possesses illegal controlled substances, in order to maintain contact with their criminal associates for future drug transactions, and so that they can have records of prior transactions for which they might still be owed money, or might owe someone else money. Drug traffickers frequently use third parties to transport shipments of illegal drugs and cash proceeds from the sale of illegal drugs. These third parties use a variety of methods to transport shipments of illegal drugs and cash, including automobiles and parcel delivery services.

## FACTS IN SUPPORT OF PROBABLE CAUSE

9.  In September 2019, investigators from the Alaska State Troopers Mat-Su Drug Unit



(AST Mat-Su) and the Drug Enforcement Administration Anchorage District Office (DEA) began conducting an investigation targeting Nathan SOFIANOS's and Korina THOMPSON's distribution of controlled substances and sales of firearms from their prior residence at 4230 North Farm Fields Place, Wasilla, AK. SOFIANOS has a prior criminal history for controlled substance violations, theft of firearms, and escape. THOMPSON has a prior criminal history for controlled substance violations and theft. Both SOFIANOS and THOMPSON have previously been convicted of crimes punishable my more than one year imprisonment, it is illegal for them to possess firearms.

10. On September 23, 2019, investigators from the AST Mat-Su and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) conducted an undercover purchase of approximately 12.28 grams of suspected heroin, approximately 29.03 grams of suspected methamphetamine, five handguns, a sawed-off shotgun, and four rifles from SOFIANOS and THOMPSON inside of their North Farm Fields Place residence. The purchase of the suspected heroin, suspected methamphetamine and assorted firearms was conducted by an ATF undercover agent (UC) and an AST Mat-Su confidential source (CS). During the controlled purchase, both the UC and CS witnessed THOMPSON inject SOFIANOS in his neck with a needle appearing to contain a heroin solution. Additionally, during the transaction, THOMPSON mentioned they also had cocaine and were willing to sell it to the UC and CS. At the conclusion of the undercover purchase, the UC asked SOFIANOS to let the UC know if he (SOFIANOS) came across any more firearms. SOFIANOS responded that he always has them.

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS

11. The AST Mat-Su CS has a consistent history of providing accurate and truthful information to law enforcement. The information provided by the CS to investigators has been independently verified by law enforcement. The CS has been providing information and acting on behalf of law enforcement for approximately six months. The CS has been financially compensated by the government for assisting in the investigation. The CS is not facing any criminal charges with any agency. The CS has a prior criminal history for theft and assault.

12. In February 2020, investigators learned SOFIANOS and THOMPSON had moved from their Farm Fields Place residence to the **TARGET RESIDENCE.** After learning this, investigators debriefed a second AST Mat-Su confidential source (CS2) who advised SOFIANOS and THOMPSON had moved, and currently reside at the **TARGET RESIDENCE.**

13. CS2 told investigators that on February 14, 2020, CS2 was at **TARGET RESIDENCE** while both SOFIANOS and THOPMSON were present. While there, CS2 observed a white male drive up to the **TARGET RESIDENCE,** and was present when this person had a discussion with THOMPSON. CS2 heard the male tell THOMPSON she still owed him $700.00, but that he was still willing to provide her with methamphetamine. THOMPSON produced $300.00 and CS2 watched as the male gave THOMPSON approximately 7 to 10 grams of methamphetamine. Shortly after the male's departure, CS2 was lead upstairs by SOFIANOS. SOFIANOS brought CS2 into a bedroom and showed CS2 approximately fourteen grams of methamphetamine in a sandwich bag, which was

further divided into individual "dime-bag" sized baggies. CS2 also told investigators that CS2 observed a handgun on the first floor of the residence, next to a drum set.

14. CS2 told investigators that before CS2 departed, THOMPSON told CS2 that she could secure ounce quantities of heroin "all day". She explained to CS2 that she paid an Anchorage supplier $1400.00 per ounce of heroin. THOMPSON also told CS2 that she could get ounce quantities of methamphetamine for $350.00 per ounce.

15. CS2 told investigators that Dale OHLER, Kyle BREEN, Kammi FAULK, and Terry YAKOVELI also reside at the **TARGET RESIDENCE.**

16. After learning of the additional occupants within the **TARGET RESIDENCE,** investigators conducted queries into their criminal histories. OHLER has a criminal history for charges to include controlled substance violations, theft, forgery, weapon offenses, and escape. In addition to his past history, OHLER currently has an active State of Alaska arrest warrant for parole violations. YAKOVELI has a criminal history for controlled substance violations, assault, and is currently on probation for controlled substance violations. BREEN has a criminal history for theft and assault. In addition to his past history, BREEN has an active State of Alaska arrest warrant for probation violation. FAULK has a criminal history for theft and controlled substance violations.

17. The information CS2 provide to investigators on the **TARGET RESIDENCE** comes from CS2's personal observations made at the **TARGET RESIDENCE**. CS2 has prior felony criminal convictions for scheme to defraud, theft of an access device, theft in the first degree, and theft in the second degree. CS2's cooperation is motivated in part by

a desire to mitigate his/her own exposure to liability for federal criminal charges, including felony distribution of controlled substances. CS2 has previously provided reliable and independently corroborated information in other investigations.

18. On February 18, 2020 SA Rose received a tip from Alaska Department of Corrections (DOC) K9 Officer Woods advising that in December 2019 DOC received information that SOFIANOS and Aaron WASHINGTON were involved in distributing narcotics together. A records check in law enforcement indices revealed WASHINGTON also resided at the **TARGET RESIDENCE** for the duration of 2019. WASHINGTON has a prior criminal history for controlled substance violations and is currently incarcerated for violating terms of his probation.

19. On February 18, 2020 AST Mat-Su Investigator Cook observed a male matching the description of SOFIANOS outside of the **TARGET RESIDENCE** cleaning snow off of a white Lincoln Continental bearing Alaska registration CKB734, which is registered to Kevin Breen from Wasilla, AK. Investigator Cook conducted a query of the vehicle in law enforcement databases and discovered the vehicle was stopped by a Wasilla Police Department Patrol Officer on February 9, 2020 for a broken tail light. The operator of the vehicle was identified as FAULK and the two passengers were THOMPSON and another female identified as Cynthia RAMIREZ. RAMIREZ has a prior criminal history for controlled substance violations.

20. On February 21, 2020 investigators conducted surveillance in in the area of the **TARGET RESIDENCE.** During the course of surveillance, investigators observed

individuals they recognized to be SOFIANOS and YAKOVELI enter and exit **TARGET RESIDENCE**.

21. Four of the six individuals identified as residing at the **TARGET RESIDENCE** have active arrest warrants. An ATF UC agent purchased ten firearms from the prior residence that THOMPSON and SOFIANOS only recently vacated. SOFIANOS has attempted to flee during several separate contacts with law enforcement. As recently as February 14, 2020, CS2 observed a handgun in the common living space of the **TARGET RESIDENCE**. All of the identified residents of the **TARGET RESIDENCE**, excluding FAULK, have convictions for assault and/or escape. At least one of the residents, OHLER, is an admitted methamphetamine user. These facts in the aggregate ground reasonable suspicion to believe that knocking and announcing would be dangerous, to wit, the residents may avail themselves of firearm(s) known to be in the residence, and the residents have a demonstrated history of violence and active resistance to law enforcement. (See *Richards v. Wisconsin,* 520 U.S. 385 (1997)).

**CONCLUSION**

22. I have probable cause to believe that Nathan SOFIANOS, Korina THOMPSON, and others, known and unknown have committed and continue to commit crimes including distribution of controlled substances and possession of controlled substances with intent to distribute in violation of 21 U.S.C. § 841(a)(1), attempt and conspiracy to commit those offenses in violation of 21 U.S.C. § 846, use of a communication facility to facilitate a controlled substance offense in violation of 21 U.S.C. § 843(b), felon in possession of a


Feb 24 2020

firearm in violation of 18 U.S.C. § 922(g)(1), and money laundering in violation of 18 U.S.C. § 1956. I also have probable cause to believe that the premises described in Attachment A will contain items of evidence that will enable investigators to more fully identify the names, phone numbers, and residences of associates of SOFIANOS, THOMPSON, and others known and unknown; and to identify the dates, times, and places for commission of illegal activities, including locations of drug sales, details surrounding drug shipments, methods and means of drug transportation and smuggling, and methods and means of transporting and/or laundering drug proceeds.

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS

 Feb 24 2020

23. The majority of the occupants observed at the **TARGET RESIDENCE** are known to have a propensity for violence towards law enforcement. Coupled with occupants past criminal history, and record of flight during law enforcement's prior contact with law enforcement I request authority for a no-knock approval, and for authority to execute this warrant at any time of day or night.

RESPECTFULLY SUBMITTED,

DAVID A. ROSE III
Special Agent,
Drug Enforcement Administration

SUBSCRIBED AND SWORN TO before me on ____February 24, 2020____.



UNITED STATES MAGISTRATE JUDGE

Affidavit in Support of Search Warrant
3:20-mj-00087-MMS